THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM P. McHUGH, Defendant-Appellant.

Fifth District   No. 82—55

Opinion filed January 6, 1984.

Randy E. Blue, of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Don W. Weber, State's Attorney, of Edwardsville (Stephen E. Norris and Mark A. LaRose, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE JONES delivered the opinion of the court:

Upon a jury trial the defendant, William P. McHugh, was convicted of two counts of reckless homicide and one count of driving under the influence of intoxicating liquor. He appeals raising three issues: (1) whether the evidence was insufficient to prove any of the three counts of which he was convicted; (2) whether the defendant was "denied a fair trial by introduction of the result of blood alcohol tests performed for medical purposes after the defendant had refused to submit to prosecutorial testing"; (3) whether the conviction for the second count of reckless homicide should be vacated because it arose from the same physical act upon which the conviction for the first count of reckless homicide is based.

The charges arose out of a collision between a truck driven by defendant and a small automobile driven by Michael Mahan, who died in the collision. The collision occurred on a clear day in the southbound lane of a bridge over which Mahan was traveling south and the defendant north. Shortly before the collision loose gravel had been put on the roadway leading to the bridge, some of which had been tracked onto the bridge by vehicles passing over the roadway onto the bridge. Defendant and the two passengers who were in the truck with him at the time of the collision, Byron Bell and Karen Pearson, were employed by the Economic Opportunity Commission in Madison County. The testimony of these two passengers was conflicting in many important respects.

Testifying for the State, Byron Bell indicated that during the afternoon of the collision, the three employees had been using the truck to move park benches and that during the course of this activity the defendant, who was driving the truck, had driven to a liquor store about two miles away. Bell said that on the way to the liquor store the defendant was "driving, you know, fast and kind of crazy, you know." The witness stated that on the way to the liquor store the defendant was driving in excess of the speed limit and was "drinking the rest of his wine that he had in the first bottle before we left the job site." The defendant, he said, purchased eight bottles of wine and a half pint of whiskey at the liquor store and in the driveway of the

liquor store opened and drank nearly all of one of the bottles of wine just purchased. The witness testified that the defendant was "running stop signs" after he left the liquor store on the way back to the job site. Asked to describe the defendant's "attitude," the witness answered, "Well, I just knew he was like drunk, you know. I don't know how his attitude is when he's drunk, you know, but he was acting kind of wild to me." The witness testified that a truck was traveling in front of theirs and that "[defendant] was riding the truck bumper." When the truck ahead reached the bridge in question it speeded up and "threw up a lot of gravel." At that point, the witness said, "[defendant] started hitting the accelerator." He described the truck as "right in front of us bumper to bumper. Pat [the defendant] was riding him on the bumper, you know, and when the truck got on that bridge that's when he really speeded up, and when he speeded up he threw up a lot of dust as white as that wall. You couldn't see nothing." "[A]s it got hard to see," the witness said, "[defendant] just—he was steady hitting the accelerator like he could see, you know." In the middle of the bridge, "when the dust was up," defendant moved from the northbound into the southbound lane and struck the decedent's white automobile. The witness had been unable to see the truck in front of them or any other vehicle through the dust. He stated that the defendant did not apply his brakes before colliding with the car and estimated the rate of speed of the truck at the time of the collision at about 50 or 60 miles per hour. In the opinion of the witness, who denied having drunk any of the alcohol himself, the defendant was intoxicated. Bell testified that he has been convicted of forgery. On cross-examination he stated that he has brought suit against the Economic Opportunity Commission because of back injuries allegedly sustained by him during the collision.

Testifying for the defendant, Karen Pearson stated that at the job site defendant had pulled a full bottle of wine out from under one of the seats of the truck. She testified further that the defendant, Byron Bell, and four others, including herself, had been drinking from the wine bottle. Asked how the defendant had driven to the liquor store, the witness answered, "Safely." She said that on the way to the liquor store he did not speed or fail to obey any lights or stop signs. She described in as "sober" on his way there and said she did not see him consume any liquor there. She testified that Bell and the defendant were drinking one of the bottles of wine as defendant drove, after leaving the liquor store. Bell threw the empty bottle from the truck, she said, and opened another, from which he and the defendant were drinking as they traveled. She testified that the defendant was no

closer to the truck in front of them than "[m]aybe two and a half, three car lengths" and was traveling at a speed of "[a]bout thirty, thirty-five" miles per hour. She said the defendant had not "tailgated" the truck in front of them. Speaking of the cloud of dust, she said, "We were coming down [the roadway,] and the green pickup truck [in front of them] hit the dust and rocks on the bridge and threw up all the dust behind us [sic]." She described the dust by saying, "You couldn't see anything. It's like I said, somebody could have walked across and you wouldn't have seen them [sic]." The witness stated that she had been unable to determine what lane of travel they were in. She testified that as they approached the cloud of dust the defendant "had already started to slow down to come on to the bridge" and applied the brakes "when we hit the cloud of dust." She stated, "[R]ight as we come out of the cloud of dust he seen the [decedent's] car, and that's when he just crammed on the brakes." In the opinion of the witness the defendant was not intoxicated at the time of the collision. On cross-examination she estimated defendant's speed at about 25 or 30 miles per hour as he came into the dust after having slowed down in his approach to the bridge. He slowed down further, she said, as he drove through the dust. She testified further to having lied to the police to protect the defendant.

The defendant's testimony was essentially in accord with that of Karen Pearson. He testified that following the collision he threw broken and unbroken bottles of wine over the bridge and tried to conceal both the liquor and the fact that he had been drinking. He said he could not have been traveling 50 or 60 miles per hour on the road in question and had seen the decedent's white car in the distance prior to the accident but had concluded that it would not reach the bridge when it did.

George Berry, a deputy sheriff who was off duty at the time of the collision but lived nearby and was summoned to help by Karen Pearson, testified that the defendant was bleeding from the mouth and had about him a "strong" odor of alcohol. The witness testified that "[the deceased] was sitting in the driver's seat behind the wheel. The wheel was—had his chest caved in. The whole front end of the car was pushed back up on his body." The deputy coroner, Ralph Bahlman, Jr., testified that the deceased

> "suffered extensive crush type injuries, which would be common in a traffic collision, to the chest area. It is my opinion that the ribs were fractured, and these fractured ribs in turn punctured the organs in the chest. He also suffered breaks to both legs and to his arms."

The witness stated that he had found no bones intact.

Roy Gibson, the deputy sheriff who was on duty at the time of the collision and who responded to the call concerning it, testified that the defendant's upper lip had been cut and that defendant "was sort of staggering, unsteady." The witness said he could smell "a little bit of liquor." He had, he said, measured skid marks of about 95 feet, including 40 feet that reflected the distance the truck had pushed the smaller vehicle along the railing of the bridge. He testified that there was "[v]ery little" gravel on the bridge. In the opinion of the witness, the driving conditions caused by the gravel required a driver to reduce his speed by 20 miles per hour. The witness had noticed, apparently as he drove to the scene of the collision over the loose rock on the roadway, a "little bit" of a cloud of dust in his rear view mirror. He testified that it was not so thick he could not see through it. As he drove over the loose rock he was following another motor vehicle.

The nurse who treated the defendant in the emergency room testified that she could smell a "strong" odor of alcohol about the defendant, but her testimony did not indicate that the defendant's behavior seemed affected by the alcohol. The witness declined to give an opinion as to whether the defendant was intoxicated. The physician who treated defendant in the emergency room, likewise, did not indicate by his testimony that defendant's behavior seemed to be affected by alcohol. The physician was, however, of the opinion that the defendant was under the influence of intoxicating liquor. The physician's opinion was based not on his observations of defendant's behavior and responses but on the results of a blood test, as may be seen from the following colloquy between the witness and the assistant State's Attorney:

"Q. [Assistant State's Attorney] *** Now, Doctor, basing your opinion of intoxication upon your conversations with the Defendant, your physical observations of him, and of the hospital medical records, and did you rely on these records in your treatment?

A. [Dr. Noor Ahmed] Yes.

Q. Basing it on all three of those things, do you have an opinion based upon a reasonable degree of medical certainty as to whether or not the Defendant was intoxicated, basing it on all the evidence?

A. I would say clinically which means by taking the history and physical examination, he was not intoxicated. His behavior was rational, cooperative, but according to the blood levels that was [sic] carried out at that time, it was on intoxication level.

Q. Again my question specifically then is based upon everything, everything in your medical file and your own physical sensory observations, was he under the influence of intoxicating liquor?

A. He was under the influence."

The blood test itself was made "a part of the Court file" but not sent to the jury.

■■■ The first count of reckless homicide of which defendant was convicted alleges that he operated a motor vehicle "at a speed which was greater than was reasonable and proper with regard to the existing traffic conditions and the safety of persons properly on the roadway ***." A person commits reckless homicide if he kills a person while he is driving a motor vehicle and the acts causing death are such as are likely to cause death or great bodily harm to an individual and are performed recklessly. (*People v. Bonzi* (1978), 65 Ill. App. 3d 927, 382 N.E.2d 1300.) A person acts recklessly in this regard when he consciously disregards a substantial and unjustifiable risk that his acts are such as are likely to cause death or great bodily harm to some individual and where such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in such a situation. (*Bonzi.*) In the case at bar the testimony is conflicting on numerous points. If the jury found Byron Bell a more credible witness than Karen Pearson, as it apparently did, and considered his testimony in light of that of Deputy Gibson, it could have concluded not only that defendant was driving too fast for the road conditions but also that he failed to respond to the sudden crisis of little or no visibility in the way a reasonable person would have done, that is, by slowing down. Further, the jury could have concluded from the testimony of Deputy Gibson that had the defendant's rate of speed been lower and appropriate to the driving conditions he, like Deputy Gibson, would have been able to follow another vehicle over the gravel and still have been able to see through the dust raised sufficiently to remain in his own lane of travel. Had he done so he would presumably have avoided colliding with a car he knew to be approaching from the other direction. For these reasons we cannot agree with the defendant that the evidence was insufficient to prove him guilty of the first count of reckless homicide.

■■ In its brief the State concedes that only one sentence can be imposed against the defendant for his two convictions of reckless homicide, both convictions having been carved from the same physical act. The State urges us, provided we affirm the defendant's conviction and sentence with respect to count I, to vacate the conviction un-

der count II, on which the trial court did not impose sentence. We hereby affirm the judgment as to count I of reckless homicide and vacate the conviction as to count II of reckless homicide.

■ With regard to the remaining issue defendant raises, the People stated at trial that the defendant had refused to allow the State to administer a blood test. The defendant correctly maintains that on the date of both the collision, on May 22, 1981, and the trial, on November 17, 18, and 19, 1981, evidence of the blood test in question was inadmissible absent the defendant's consent to such a test. (Ill. Rev. Stat. 1981, ch. 95½, par. 11—501(c)(3); *People v. Todd* (1975), 59 Ill. 2d 534, 322 N.E.2d 447; *People v. Weissinger* (1980), 90 Ill. App. 3d 700, 413 N.E.2d 497). In *Weissinger*, where the blood sample was taken on the initiative of a doctor at the hospital to which the defendant was taken after the accident occurred, as apparently happened in the case at bar, the court concluded:

"The statute prescribes that evidence of such a test 'shall not be admitted' without consent. This protection for the defendant is absolute; it is not in any way conditioned upon participation by the State in the test procedures. Further, if we were to draw the distinction argued by the State there could be no assurance that the actions of medical personnel would be free of motivation to aid in law enforcement, which would result in the legislative requirement of consent becoming virtually meaningless." 90 Ill. App. 3d 700, 702, 413 N.E.2d 497, 499.

■ In the instant case the State draws no such distinction but argues on the basis of *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171, and *People v. Mello* (1980), 87 Ill. App. 3d 506, 409 N.E.2d 152, that because a physician in formulating an opinion may rely on the medical records of a patient, though the medical records have not been admitted into evidence, the physician in the instant case could, likewise, render his opinion as to the defendant's intoxication on the basis of the defendant's medical records, including the blood test for alcohol. The psychiatrist in *Ward*, however, neither rendered an opinion as to the defendant's intoxication nor referred to a blood test for alcohol. *Mello*, which relied heavily upon *Ward*, involved a physician's testimony as to the defendant's acute ethanolism and a blood alcohol test. In *Mello*, however, as Justice Stouder pointed out in his special concurrence,

"no issue was presented as to the propriety of the medical opinion based on a report which would have been incompetent evidence had the same been proffered directly. For instance, in the instant case a foundation for admitting the laboratory re-

port was established, but the report itself was never proffered as evidence. If the laboratory report could not have been admitted as evidence, then it well might be the opinion testimony based on it would have been improper. Since the defendant's objection was based solely on the fact the laboratory report was not admitted as evidence rather than on any claim the report would have been inadmissible, I agree with my colleagues, but with the caveat that the competency of such reports might be material." (87 Ill. App. 3d 506, 511, 409 N.E.2d 152, 155.)

In the case at bar, unlike *Mello*, the impropriety of the use of the results of the blood test for alcohol in the formulation of the physician's opinion has been argued vigorously by counsel both at trial and on appeal. To permit a physician to render an opinion as to a defendant's intoxication upon the basis of a blood test for alcohol, itself inadmissible for lack of the defendant's consent to it, would, as the court in *Weissinger* concluded, render meaningless the legislative requirement of consent then in effect. (*Cf.* Ill. Rev. Stat. 1981, ch. 95½, pars. 11—501.1, 11—501.2, as amended by Pub. Act. 82—311, eff. Jan. 1, 1982 (1981 Ill. Laws 1745-53), providing for the implied consent of drivers on public highways to chemical tests of the blood for alcohol, the results of which shall be admissible at trial.) It was therefore error to permit the physician to rely upon the results of the blood test for alcohol in rendering his opinion that the defendant was under the influence of intoxicating liquor.

In the alternative the State argues that even if "there was any impropriety in Dr. Ahmed's consideration of the blood test in formulating his opinion that the defendant was intoxicated, any error should be deemed harmless because there was sufficient independent evidence of intoxication to sustain convictions on Counts II and III." Count II of reckless homicide alleged that the defendant operated a motor vehicle "while under the influence of an intoxicating liquor without regard to the safety of persons properly on the roadway ***." Count III is the count of driving under the influence of intoxicating liquor.

■■ We must bear in mind that testimony concerning drinking, standing alone, cannot be equated with intoxication, nor can the use of alcoholic liquor, standing alone, characterize a person as intoxicated. (*People v. Shackles* (1977), 44 Ill. App. 3d 1024, 358 N.E.2d 1329.) Proof of intoxication requires more than evidence that the defendant consumed alcohol. (*Shackles.*) In the instant case there is undisputed evidence that the defendant consumed alcohol and smelled, according to some witnesses, strongly of alcohol. However,

there is relatively little evidence of intoxication, apart from the results of the blood-alcohol test. Deputy Gibson testified that defendant was "sort of staggering, unsteady." Nevertheless, the defendant had suffered a facial injury in the collision, and his unsteadiness might have been caused by the injury. Although in the opinion of Byron Bell the defendant was intoxicated, in the opinion of Karen Pearson he was not. While questions of credibility are to be resolved by the trier of fact, the opinion of the physician, based on the results of the blood test, could well have lent credence to the opinion of Byron Bell. Given the relative paucity of evidence of defendant's intoxication, the use of the results of the blood test by the physician in formulating his opinion as to defendant's intoxication may have caused the jury to reach a result different from the one it might have reached had the physician's opinion not been based upon the results of the blood test. Thus, the error may not be deemed harmless, and the judgment rendered on count III must be reversed.

Judgment as to count I of reckless homicide affirmed; verdict as to count II of reckless homicide vacated; judgment as to count III of driving under the influence of intoxicating liquor reversed.

HARRISON and KASSERMAN, JJ., concur.